**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| VALERIA PARKS, | |
| Plaintiff, | Civil Action No.: |
| v. | |
| DOLGENCORP, LLC, d/b/a Dollar General Corporation, | 5:20-cv-00472 |
| Defendant. | **JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW, Plaintiff Valeria Parks and brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* Plaintiff alleges that Defendant DOLGENCORP, LLC, d/b/a Dollar General Corporation, subjected her to harassment based on sex and retaliation after she engaged in protected activities, all resulting in her constructive termination, respectfully showing the Court as follows:

### JURISDICTION AND VENUE

1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, 28 U.S.C. § 1331, and 28 U.S.C. § 1343.

2.

Venue is proper in this judicial district under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391 because Plaintiff was employed and the events underlying this action occurred in Macon-Bibb County, Georgia, which is located in this judicial district.

## PARTIES

3.

Plaintiff Valeria Parks (hereinafter, "Plaintiff" or "Parks") is a citizen of the United States and a resident of Georgia.  At all times relevant to this suit, Ms. Parks was employed with Defendant DOLGENCORP, LLC, d/b/a Dollar General Corporation.

4.

At all relevant times, Ms. Parks was considered a covered employee under Title VII of the Civil Rights Act.

5.

Defendant DOLGENCORP, LLC, d/b/a Dollar General Corporation (hereinafter, "Defendant") is a foreign limited liability company, organized under the laws of the State of Kentucky.

6.

Defendant's principal office address is 100 Mission Ridge, Goodlettsville, Tennessee 37072, and Defendant may be served with process through its registered agent, Corporation Service Company, located at 192 Anderson Street, Suite 125, Marietta, Cobb County, Georgia 30060.

7.

Defendant is a private employer engaged in interstate commerce, with annual revenue in excess of $500,000.  Defendant has more than fifteen employees who have worked for at least twenty calendar weeks in 2018 and preceding years. Defendant owns and operates more than 16,000 discount retail stores across the United States.

8.

Defendant is a covered entity and employer within the meaning of Title VII of the Civil Rights Act.

**STATEMENT OF FACTS**

9.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 8, as if the same were set forth herein.

10.

In 2018, Ms. Parks interviewed for a position as Assistant Store Manager of Defendant's Dollar General Market (Store Number 9812), located at 370 Gray Highway, Macon, Bibb County, Georgia 31204.

11.

Ms. Parks received an offer of employment, and she began her employment on November 17, 2018.

12.

When Ms. Parks began, she was not placed into the supervisory position that she had been offered as the outgoing Assistant Store Manager was still employed in the position. Ms. Parks began working as a Sales Associate.

13.

Initially, Ms. Parks did not receive compensation at the hourly rate that she had been told.

14.

When Ms. Parks raised the issues, Store Manager Maurice Smith (hereinafter, "Store Manager Smith") assured Ms. Parks that she would be moved into the position of Non-Food

Manager in December and that the rate of her hourly wage would be changed immediately.

15.

Over the next month, Ms. Parks' performance was exemplary, and, as had been promised, Ms. Parks was made Non-Food Manager on or about December 8, 2018.

16.

Store Manager Smith was Ms. Parks' supervisor in both the positions as Sales Associate, as well as Non-Food Manager.

17.

Ms. Parks had been an acquaintance of Store Manager Smith as the two had attended the same middle school.

18.

In Summer 2018, Ms. Parks and Store Manager Smith encountered one another when Store Manager Smith had been employed in Defendant's warehouse and saw Ms. Parks who was there for a job interview.

19.

At the end of October 2018, soon after he had been hired to manage the store at issue, Store Manager Smith contacted Ms. Parks and suggested that she apply for his store since he knew that Ms. Parks was still seeking employment.

20.

However, shortly after Ms. Parks began her employment, Store Manager Smith's conduct toward Ms. Parks changed from friendly to making apparent sexual advances that became more frequent and inappropriate in nature.

21.

Around the same time, Store Manager Smith sent Ms. Parks a message, suggesting that the two have dinner together one night.  Ms. Parks did not respond to the suggestion.

22.

Store Manager Smith would also frequently call Ms. Parks on her personal telephone late into the evening and well after working hours.

23.

On these calls, Store Manager Smith would say that he could not help but liking Ms. Parks and that he was "very attracted" to her.

24.

On another occasion, Store Manager Smith told Ms. Parks that he "love[ed] sex."

25.

The calls and comments made Ms. Parks extremely uncomfortable and were unwelcomed by her.  As a result, she would attempt to end each conversation by finding an excuse to end the call.

26.

Store Manager Smith ended one of these telephone conversations after he simply told Ms. Parks that he was "horny," before he abruptly hung up the phone.

27.

Store Manager Smith had obtained Ms. Parks telephone number in October 2018 , after he saw her seeking employment, and asked her to call him so he could suggest that she apply to work for Defendant at his store.

28.

Before he had Ms. Parks' mobile phone number, Store Manager Smith had been solely messaging Ms. Parks through Facebook Messenger.  However, shortly after Ms. Parks began working, he began sending Ms. Parks text messages, clearly seeking to solicit a romantic and sexual relationship with Ms. Parks.

29.

On one occasion, Store Manager Smith sent a late-night text message of a picture of a glass of wine and salmon, which Ms. Parks perceived as his suggestion that the two have a date or romantic dinner together.

30.

Store Manager Smith also sent frequent text messages, asking for Ms. Parks to visit his home or suggesting that Ms. Parks invite him to visit her own home.

31.

On November 26, 2018, Store Manager Smith informed Ms. Parks that he had to travel to another store in Athens, Georgia to help the store "get up to company standards," and he asked Ms. Parks to accompany him for the trip.

32.

Ms. Parks thought that it was strange that her supervisor was asking an employee, who had only been working for one week and had little knowledge about company standards, to participate in such a visit.

33.

Ms. Parks was trying to keep her job and she agreed to accompany the Store Manager on the trip.

34.

During the drive, Ms. Parks pretended to listen to music on her headphones so as to avoid conversing with Store Manager Smith.  She was concerned that the Store Manager would use this opportunity to make a sexual advance toward Ms. Parks.

35.

During the travel back to Macon, Store Manager Smith pulled up to a stop sign. Once stopped, he looked at Ms. Parks and said, "don't be surprised if I leaned over to kiss you."

36.

Store Manager Smith then moved his body toward Ms. Parks.  Ms. Parks immediately pulled away and firmly stated, "no!  Please don't do that."

37.

When Ms. Parks returned to the Macon store, she immediately told Front End Lead Sales Associate Carly Beaufait about the incident and stated that it had made her uncomfortable.  Ms. Beaufait suggested that Ms. Parks tell Store Manager Smith that she had a "crazy boyfriend" in order to dissuade him from continuing to make advances.  Ms. Beaufait also told Ms. Parks that the Store Manager had asked Ms. Beaufait to accompany him on the trip, but that she had refused.

38.

One to two days later, while Ms. Parks was arranging items on the store's Christmas aisle, Store Manager Smith approached Ms. Parks and grasped both of Ms. Parks' upper arms, while biting his lip in a suggestive manner.

39.

Store Manager Smith then pulled Ms. Parks toward him and he leaned toward her.  Ms. Parks immediately responded, "no, no, no, Maurice.  Please stop.  Please don't do this."

40.

Ms. Parks was unable to push her supervisor away from her with her hands because she was still holding the merchandise that she had been organizing.

41.

She pulled her body away from the Store Manager and was able to escape his grip. After breaking away, Ms. Parks hit a display with enough force to knock it to the floor.

42.

Two customers who were shopping in the store observed, at least, part of this incident.

43.

Ms. Parks believes that this incident should have been in view of, and captured by, one of the store's security cameras.

44.

Defendant later admitted that it reviewed the security camera footage for the days in question, but Defendant failed to offer any further explanation of what had been observed.

45.

On August 30, 2019, Ms. Parks, through counsel, demanded that Defendant preserve any video and audio footage reflecting the days and incident at issue.

46.

After this November 27th or 28th incident, Ms. Parks observed Store Manager Smith in the same room containing the video surveillance and security equipment for an extended period of time.

47.

Upon information and belief, Store Manager Smith tampered with and/or destroyed the footage of the incident.

48.

Store Manager Smith continued to subject Ms. Parks to similar harassment over the next several weeks.

49.

On one occasion, Store Manager Smith asked Ms. Parks to do a walk-through of the store with him.  When the Store Manager entered into the produce cooler, Ms. Parks refused to follow the supervisor.

50.

When Ms. Parks later reported the produce cooler incident to Assistant Store Manager Meco Harris (hereinafter, "Asst. Store Manager Harris"), she responded to Ms. Parks' report by suggesting that the Store Manager brought Ms. Parks to the produce cooler because it was not within the view of security cameras.

51.

During a different walk-through of the store with Ms. Parks, Store Manager Smith began discussing the size of his genitals.

52.

On another day, Ms. Parks went to the Store Manager's office to ask a question.  The Store Manager was sitting in a chair facing Ms. Parks as she began to talk.  Ms. Parks realized that Store Manager Smith was looking suggestively at Ms. Parks, was opening and closing his thighs, was licking his lips, and his penis was visibly erect.

53.

Ms. Parks abruptly stopped talking when she saw this. Store Manager Smith responded, "sorry, this weather does something to me," apparently referring to the rain that day.

54.

On or about December 15, 2018, Ms. Parks reported most of the aforementioned conduct to Asst. Store Manager Harris.  The Asst. Store Manager said that she would report this information and it would be investigated. Asst. Store Manager Harris later told Ms. Parks that she had advised District Manager Rick Barker (hereinafter, "District Manager") of her allegations.

55.

Ms. Parks intentionally omitted reference to the incident that occurred on the Christmas aisle from her report because of her concern that Store Manager Smith would find out about her complaint and tamper with the security footage.

56.

Apparently, the District Manager contacted Store Manager Smith via telephone, and the Store Manager denied the allegations.

57.

Over the next days after Ms. Parks' complaint, Defendant failed to take any other action concerning the allegations, and Ms. Parks continued to be supervised by Store Manager Smith.

58.

After he had apparently been questioned by the District Manager, Store Manager Smith changed the schedule so that Ms. Parks would be forced to work the closing shift each night.

59.

Ms. Parks also overheard a telephone call between two supervisors, where Store Manager Smith stated that he did not want to work with Ms. Parks because she was "playing with [his] livelihood."

60.

By December 20, 2018, Ms. Parks was no longer able to tolerate her supervisor's harassment and conduct.  Ms. Parks prepared a letter of resignation, which was intended as her two-week notice, and delivered it to Asst. Store Manager Harris.  Asst. Store Manager Harris asked Ms. Parks to reconsider her resignation and said that she would hold Ms. Parks' resignation until Ms. Parks made a final decision.

61.

On the afternoon of December 20, 2018, Ms. Parks contacted District Manager Rick Barker (hereinafter, "District Manager Barker").

62.

During Ms. Parks' the conversation with the District Manager, he expressed skepticism about Ms. Parks' allegations and said that he would need evidence of what had occurred.  The District Manager also spoke positively about Store Manager Smith.

63.

Store Manager Smith had scheduled Ms. Parks to work the closing shift on December 21, 2018.  However, since there was already a manager on duty, Ms. Parks requested that Asst. Store

Manager Harris move her to the morning shift.  Asst. Store Manager Harris warned Ms. Parks that Store Manager Smith would be opening the store, adding that he would leaving for an appointment soon thereafter.

64.

On December 21, 2018, Asst. Store Manager Harris called Ms. Parks at 8:07 am, confirming that the Store Manager had left the store for his appointment, and asked Ms. Parks if she still wanted to come in.  Ms. Parks arrived at work at 9:00 am.

65.

When Ms. Parks arrived, Store Manager Smith had returned from his appointment.  He immediately called Ms. Parks into his office, and he loudly demanded to know why the store had not opened on time.

66.

Ms. Parks responded, explaining that she had not been scheduled to work that morning, asking why the Store Manager would have left the store for his appointment if there had not been anyone there to open, and stating that she believed that Store Manager Smith's treatment of her, including the changes to her schedule, had all been motivated by her reports of sexual harassment.

67.

Store Manager Smith then yelled at Ms. Parks, ultimately telling her to leave his office.

68.

Ms. Parks immediately handed her badge and keys to Store Manager Smith and told him that she was done.

69.

On December 26, 2018, Ms. Parks drafted a hand-written complaint, which included descriptions of all of the incidents of harassment, and sent the statement to District Director Barker via email the same day.

70.

District Director Barker asked Ms. Parks to bring the original copy of the statement to him in a sealed envelope. Ms. Parks knew that the scanned copy that she sent was sufficient, and she was not comfortable giving away her original copy.

71.

During that conversation, District Director Barker told Ms. Parks that she was not allowed to return to the store and her position, unless Store Manager Smith were found "guilty."

72.

Several days later, Ms. Parks received a Georgia Department of Labor Separation Notice, dated December 28, 2018, stating that Ms. Parks was being separated from her employment with Defendant because she "LEFT VOLUNTARILY WITHOUT NOTICE" on December 21, 2018.

73.

Approximately one month after Ms. Parks' separation, she was contacted by Defendant's human resources representative about the investigation into Store Manager Smith.  Ms. Parks advised the representative, several times, that she was represented by counsel. The human resources representative continued asking questions.

74.

Ms. Parks has no other knowledge of an internal investigation, nor of the results thereof, and Defendant has not invited Ms. Parks to return to work.

75.

Upon information and belief, Store Manager Smith resigned from his position when he discovered that he was under investigation for sexual harassment of a female employee.

76.

Upon information and belief, this investigation was not into Store Manager Smith's harassment of Ms. Parks.

77.

Since her separation, Ms. Parks has applied to work at several other of Defendant's stores, but she has generally not received a call back or invitation to interview.

78.

Ms. Parks applied for a position in Defendant's warehouse, and she was scheduled for an interview on November 3, 2020.   During the interview, Ms. Parks was told that she met the qualifications for the position and follow up in two days.   When Ms. Parks contacted human resources on November 5, 2020, she was told that she was not chosen for the position, but was not given a reason.

79.

Defendant rejected Ms. Parks' application because she had reported her supervisor's harassment of her and filed a Charge of Discrimination.

80.

Since the events described herein, Ms. Parks has struggled with anxiety and depression to the extent that she has been forced to seek mental health treatment to address her symptoms.

81.

Ms. Parks often experiences feelings of panic and flashbacks to the harassment, and she finds that this has affected her ability to maintain other employment.

82.

Ms. Parks has been diagnosed with Post Traumatic Stress Disorder due to the harassment that she experienced working with Defendant and the impacts to her health.

Procedural/Administrative Background

83.

On or about February 11, 2019, Ms. Parks submitted her Charge of Discrimination to the Equal Employment Opportunity Commission (hereinafter, "EEOC").  The Charge was assigned Charge Number 410-2019-02774.

84.

Upon Ms. Parks' request, the EEOC subsequently issued a Notice of Right to Sue.  While Ms. Parks has not received the Notice of Right to Sue to date, her counsel received one copy via electronic mail on September 22, 2020, and on October 1, 2020 via First Class Mail.

85.

Ms. Parks is filing this civil action within ninety days of her receipt of the Notice of Right to Sue.

**COUNT I:**
**HARASSMENT BASED ON SEX**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**

86.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 85, as if the same were set forth herein.

87.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to discriminate against or harass any of its employees on the basis of sex.  *See* 42 U.S.C. § 2000e-2(a).

88.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under Title VII, respectively.  *See* 42 U.S.C. §§ 2000e & 2000e-1.

89.

As alleged herein, Defendant, through the conduct of its employee, Maurice Smith, subjected Plaintiff to harassment in the form of unwelcome verbal and physical conduct involving and because of her sex.

90.

As alleged herein, the harassment affected a term or condition of Plaintiff's employment and had the purpose and effect of unreasonably interfering with the work environment and created an intimidating, hostile, and offensive work environment.

91.

As alleged herein, not only was Plaintiff's direct supervisor responsible for the harassment, Defendant was on notice of this conduct and did nothing to prevent the harassment from occurring.

92.

The harassment experienced by Plaintiff was severe, pervasive, abusive, hostile, and unwelcome by Plaintiff and occurred because of her sex.

93.

Defendant's conduct as alleged herein constitutes harassment and hostile work environment based on sex in violation of Title VII.

94.

Plaintiff has been injured by Defendant's harassment of her based on her sex, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, compensatory and punitive damages in the amount of $300,000.00, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

## COUNT II:
## RETALIATION
## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

95.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 85, as if the same were set forth herein.

96.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to discriminate against or harass any of its employees because an employee has opposed any practice made unlawful by Title VII.  42 U.S.C. § 2000e-3(a).

97.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under Title VII, respectively, *See* 42 U.S.C. §§ 2000e & 2000e-1.

98.

During her employment with Defendant, Plaintiff's supervisor subjected Plaintiff to sexually-based conduct that was both severe and pervasive enough to change the working conductions and unwelcomed by Plaintiff.

99.

Plaintiff had a reasonable, good faith belief that her supervisor's conduct was actionable sexual harassment.

100.

Plaintiff's supervisor's conduct toward her was actionable sexual harassment.

101.

Plaintiff opposed her supervisor's conduct by requesting that the supervisor cease the behavior.

102.

Plaintiff opposed her supervisor's conduct by reporting the conduct to several individuals in management.

103.

An employee who complains about the type of harassment alleged is opposing a practice made unlawful by Title VII of the Civil Rights Act and is, therefore, engaged in a "protected activity."

104.

After Plaintiff opposed the harassment, she was subjected to materially adverse actions from the same supervisor, such as being subjected to additional harassment and having her working hours reduced, as well as being threatened by the supervisor.

105.

As alleged herein, the aforementioned adverse actions only began after Plaintiff opposed and reported her supervisor's harassment.  For this reason, amongst others, these adverse actions only occurred because of Plaintiff's participation in protected activities.

106.

Three days after Plaintiff reported her supervisor's harassment to management, the harassment had become so severe that Plaintiff was constructively discharged.

107.

Plaintiff then filed a Charge of Discrimination with the Equal Employment Opportunity Commission, alleging sexual harassment.

108.

An employee who causes a charge to be filed for violations of Title VII of the Civil Rights Act is engaged in a "protected activity."

109.

After Plaintiff filed her Charge of Discrimination, Defendant refused to reinstate Plaintiff into her position.

110.

After Plaintiff filed her Charge of Discrimination, Defendant refused to consider Plaintiff's application for another position with Defendant of which Plaintiff was qualified and had applied.

111.

Defendant's conduct, as alleged, herein constitutes retaliation in violation of Title VII of the Civil Rights Act.

112.

Defendant is unable to articulate any legitimate, nondiscriminatory or nonretaliatory reason for the conduct and Plaintiff will provide that Defendant's stated reason for her termination was merely pretextual for Defendant's retaliatory animus.

113.

Plaintiff has been injured by Defendant's retaliation of her, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, compensatory and punitive damages in the amount of $300,000, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

## COUNT III:
## CONSTRUCTIVE DISCHARGE
## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

114.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 85, as if the same were set forth herein.

115.

Under Title VII of the Civil Rights Act, it unlawful for an employer to discharge any employee on the basis of sex.  *See* 42 U.S.C. § 2000e-2(a).

116.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under Title VII, respectively.  *See* 42 U.S.C. §§ 2000e & 2000e-1.

117.

A claim for constructive discharge "is appropriate when an employer discriminates against an employee to the point such that his working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign."  *Hicks v. City of Tuscaloosa, Ala.*, 870 F.3d 1253, 1258 (11th Cir. 2017).

118.

For the reasons set forth in Count I, *supra*, which are incorporated herein, Defendant subjected Plaintiff to harassment and hostile work environment based on her sex.

119.

Any reasonable person in Plaintiff's position would feel that her working conditions were so intolerable that she would feel compelled to resign.

120.

As a result of the harassment and hostile work environment described herein, Defendant made Plaintiff's working conditions so intolerable that Plaintiff felt compelled to submit her resignation on or about December 21, 2018.

121.

Defendant's conduct as alleged herein constitutes constructive discharge based on sex in violation of Title VII.

122.

Plaintiff will prove that Defendant's stated reasons for its conduct were not the true reasons, but, instead, were pretext to hide Defendant's discriminatory animus.

123.

Plaintiff has been injured by Defendant's constructive discharge, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, compensatory and punitive damages in the amount of $300,000, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Valeria Parks respectfully prays for the following relief:

1)      That Summons and Process be issued to Defendant DOLGENCO, LLC, d/b/a Dollar General Corporation, and that said Defendant be served as provided by law;

2)      That this matter be tried before a jury;

3)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count I for harassment based on sex in violation of Title VII of the Civil Rights Act, and grant Plaintiff all relief allowable under said law;

4)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count II for retaliation for engaging in protected activities in violation of Title VII of the Civil Rights Act, and grant Plaintiff all relief allowable under said law;

5)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count III for constructive discharge based on sex in violation of Title VII of the Civil Rights Act, and grant Plaintiff all relief allowable under said law;

6)      For such other relief as this Court shall deem just and proper.

[*Signature Page Follows*]

Respectfully submitted, this 16th day of December, 2020.

KENNETH E. BARTON III
Georgia Bar No. 301171
MISHAEL K. NAJM
Georgia Bar No. 747961
*Attorneys for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com
mkn@cooperbarton.com